FILED

08/08/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0207

DA 16-0207

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 191

ANDREW DAVID GOLIE,

       Petitioner and Appellant,

  v.

STATE OF MONTANA,

       Respondent and Appellee.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DV 14-02
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Joseph P. Howard, Joseph P. Howard, P.C., Great Falls, Montana

       For Appellee:

           Timothy C. Fox, Montana Attorney General, Ryan W. Aikin,
Assistant Attorney General, Helena, Montana

           William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  June 14, 2017

Decided:  August 8, 2017

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Andrew David Golie (Golie) appeals the denial of his petition for postconviction relief (PCR), which claimed ineffective assistance by his trial counsel. We affirm, and address the following issues:

> 1. *Did counsel render ineffective assistance by not objecting to the mental-state jury instruction?*
>
> 2. *Did counsel render ineffective assistance by not objecting to evidence regarding Golie's "brothers" or "Modern Outlaw"?*
>
> 3. *Did counsel render ineffective assistance by revealing that Golie was on probation?*
>
> 4. *Did counsel render ineffective assistance by not objecting to the admission of testimony that vouched for the testimony of others?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In January 2011, a Hamilton, Montana, pawn shop was burglarized. Among the items taken was a unique necklace with a broken clasp. Law enforcement investigated, but identified no suspects. In March 2011, Josh Edmondson (Edmondson) attempted to pawn the necklace with the broken clasp at the same pawn shop. The shop owner recognized the necklace and confronted Edmondson, who said that a friend named Andrew had given the necklace to him, but claimed to not know Andrew's last name. Edmondson telephoned Golie, who acknowledged the necklace was stolen and told Edmondson he was stupid for having tried to pawn it.

¶3 The following day, Golie and a friend, Wilkins, appeared at Edmondson's home around 10:30 p.m. Golie instructed Edmondson to confess to authorities that Edmondson

2

had stolen the necklace, and told Edmondson that he knew where Edmondson's child slept, his dog slept, and where he lived. Fearing for his family's safety, Edmondson contacted law enforcement.

¶4 Golie was charged with felony intimidation, § 45-5-203(1)(a), MCA, and felony tampering with witnesses and informants, § 45-7-206(1), MCA. Sasha Brownlee (Brownlee) represented Golie throughout the trial proceedings, in which the jury acquitted Golie of intimidation, but convicted him on the witness tampering charge. Golie appealed, arguing to this Court that Brownlee was ineffective for failing to object to a jury instruction. Reasoning that the claim could not be reviewed on direct appeal, we affirmed Golie's conviction without prejudice to his pursuit of postconviction relief. *State v. Golie*, 2013 MT 321N, No. DA 12-0454, 2013 Mont. LEXIS 441.

¶5 Golie filed a PCR petition in January 2014, stating eight claims of ineffective assistance of counsel (IAC) by Brownlee. In a 75-page order, the District Court extensively analyzed and denied all claims. Golie appeals four of those claims. Additional facts as necessary are cited herein.

### STANDARDS OF REVIEW

¶6 We review a district court's denial of postconviction relief to determine if the court's findings of fact are clearly erroneous, and if its conclusions of law are correct. *Lacey v. State*, 2017 MT 18, ¶ 13, 386 Mont. 204, 389 P.3d 233 (citing *Kenfield v. State*, 2016 MT 197, ¶ 7, 384 Mont. 322, 377 P.3d 1207). We review de novo the mixed questions of law and fact presented by claims of ineffective assistance of counsel. *Whitlow v. State*, 2008

3

MT 150, ¶ 9, 343 Mont. 90, 183 P.3d 861 (citing *State v. Racz*, 2007 MT 244, ¶ 13, 339 Mont. 218, 168 P.3d 685).

## DISCUSSION

¶7    A defendant's right to counsel is guaranteed both by the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution. *Whitlow*, ¶ 10. Ineffective assistance claims are evaluated under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Whitlow*, ¶ 10; *Lacey*, ¶ 23.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. "A defendant must satisfy both prongs of this test in order to prevail on an ineffective assistance of counsel claim." *Whitlow*, ¶ 11 (citing *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63, 153 P.3d 601). As such, "if an insufficient showing is made regarding one prong of the test, there is no need to address the other prong." *Whitlow*, ¶ 11 (citing *Adams*, ¶ 22).

¶8    Under the first prong, a defendant must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. Although strategic decisions may be considered sound, and thus effective, categorizing actions as strategic or tactical "does not necessarily mean that the conduct was

objectively reasonable." *Whitlow*, ¶ 18. Accordingly, whether counsel's actions come within the "wide range of professionally competent assistance" is determined by "the facts of the particular case, viewed at the time of counsel's conduct" and must be viewed "in light of all the circumstances." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

¶9 The second prong requires demonstration that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S at 694, 104 S. Ct. at 2068.

¶10 "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. There is a "strong presumption" that counsel's actions "'fall[] within the wide range of reasonable professional assistance.'" *Whitlow*, ¶ 15 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065); *accord Lacey*, ¶ 24; *Taylor v. State*, 2014 MT 142, ¶ 12, 375 Mont. 234, 335 P.3d 1218. We thus turn to Golie's claims.

¶11 *1. Did counsel provide ineffective assistance by not objecting to the mental-state jury instruction?*

¶12 In his direct appeal, Golie argued Brownlee was ineffective by failing to object to the conduct-based mental state instructions given to the jury. *Golie*, ¶ 5. We affirmed in a non-cite opinion, stating:

> The record here simply does not allow us to undertake an adequate review of Golie's IAC allegation and, therefore, he must seek postconviction relief (PCR). It is unclear from the record why Brownlee did not object to the

5

> conduct-based "knowingly" jury instruction. Brownlee's actions may well have been taken within her tactical discretion; inquiry into the reasons for her decision may properly occur in PCR.

*Golie*, ¶ 7. Golie argues that the "obvious implication" of this language is that witness tampering is a result-based offense, which became binding law of the case upon remand. However, as the District Court concluded, Golie reads too much into our opinion, which merely held that the issue could not be reviewed on direct appeal, but could be pursued in postconviction proceedings. We did not reach the merits of the instructional issue.

¶13 The District Court instructed the jury that a person "acts knowingly when the person is aware of his conduct," and "acts purposely when it is the person's conscious object to engage in conduct of that nature." Golie claims that Brownlee was ineffective by not objecting to these conduct-based instructions, because witness tampering is a result-based offense that criminalizes causing someone to "testify or inform falsely" or "withhold any testimony, information, document or thing," which are results. Golie argues the statute does not particularize conduct, which could be a wide variety of actions, but rather particularizes results, and required result-based mental state instructions.[1]

¶14 In *State v. Lambert*, 280 Mont. 231, 929 P.2d 846 (1996), upon which Golie relies, we considered whether the offense of criminal endangerment, § 45-5-207(1), MCA, was a conduct-based or result-based crime. Under the statute, a person who "knowingly engages

---

[1] "Knowingly" is alternatively defined as follows: "A person acts knowingly with respect to the *result of conduct* described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct." Section 45-2-101(35), MCA (emphasis added). "Purposely" is likewise alternatively defined. Section 45-2-101(65), MCA.

in conduct that creates a substantial risk of death or serious bodily injury to another," commits the crime. Section 45-5-207(1), MCA. The district court in *Lambert* gave the jury an instruction defining "knowingly" as a conduct-based offense. *Lambert*, 280 Mont. at 234, 929 P.2d 847. We held the district court erred by giving a conduct-based mental intent instruction, because § 45-5-207(1), MCA, "emphasizes result over conduct," and explained as follows:

> The portion of the statute that we are reviewing here does not particularize the conduct that, if engaged in, results in the commission of the offense. Rather, a person may engage in a wide variety of conduct and still commit the offense of criminal endangerment, provided that the conduct creates a substantial risk of death or serious bodily harm. *It is the avoidance of this singular result*, the risk of death or serious harm, that the law attempts to maintain.

*Lambert*, 280 Mont. at 236, 929 P.2d at 849 (emphasis added). Without creating the result of substantial risk of death or serious bodily injury, one has not committed the crime of criminal endangerment.

¶15 In contrast, witness tampering, § 45-7-206, MCA, criminalizes conduct, not a result. The statute provides:

> A person commits the offense of tampering with witnesses and informants if, believing that an official proceeding or investigation is pending or about to be instituted, the person purposely or knowingly attempts to induce or otherwise cause a witness or informant to:
>
> (a) testify or inform falsely;
>
> (b) withhold any testimony, information, document, or thing;
>
> (c) elude legal process summoning the witness or informant to testify or supply evidence; or

7

(d)  not appear at any proceeding or investigation to which the witness or informant has been summoned.

Section 45-7-206(1), MCA.  The statute criminalizes, when one believes an official proceeding or investigation is pending, an *attempt* to "induce or otherwise cause a witness or informant" to lie, withhold information, elude process, or not appear.  Section 45-7-206(1), MCA.  Under the text, the crime does not require a witness or informant to actually be induced to carry through with the action—a particular result is not criminalized.  As the State correctly notes, the statute has "no requirement that any particular result actually be achieved."

¶16    The District Court's conduct-based instructions defining "knowingly" and "purposely" were correct, and Brownlee's lack of an objection did not constitute ineffective assistance.

¶17    *2. Did counsel render ineffective assistance by not objecting to evidence regarding Golie's "brothers" or "Modern Outlaw"?*

¶18    Breanna Chaffin (Chaffin), Edmondson's wife at the time of the incident, testified at trial that when Golie appeared at their home, he stated, "I'm not getting in trouble for this.  So you better figure out how to fix it because I have people in this town that I know and I have brothers that you know what we're capable of."  This was the first mention of Golie's "brothers," but the topic was addressed during redirect examination of Shawna Cantrell (Cantrell), Golie's wife.  Cantrell stated that Golie had only one, biological brother, but that he referred to "[h]is friends" as his "brothers."  When asked about "Modern Outlaw," Cantrell stated:

Q. Have you ever heard of Modern Outlaw?

A. Yeah, I've heard of it.

Q. What's that?

A. It's a family.

Q. It's a family?

A. Yeah.

Q. Family, what—of what?

A. I'm not really sure about the whole thing.

She later added that it was not a gang, but a "family of people" that included Golie.

¶19 Detective Steven Brunner-Murphy (Brunner-Murphy) testified:

Q. Mr. Golie made a statement about brothers. Do you understand the significance of that, sir?

A. I do.

Q. What is that?

A. In Mr. Golie's position, the term "brothers" is one that I've heard him refer to other people as. Not commonly just your blood family members or stepbrothers or something like that.

I've listened to a number of Mr. Golie's phone calls while he's been incarcerated. And during a number of these calls he makes reference to brothers and having contact with brothers.

He makes reference to Modern Outlaw along those same lines as—speaking of his brothers and Modern Outlaw and talks about it as if it's some sort of group or association or gang of some sort.

Q. Is it a family?

A. To the best of my knowledge, I haven't—I'm aware of most of Mr. Golie's family members, and I have not been able to make any of those connections.

¶20    Brownlee did not object to this testimony regarding Golie's "brothers" or the references to "Modern Outlaw," but questioned Golie about the references during his direct examination.  Golie denied that he was involved in a gang, and explained that the term "Modern Outlaws" was one he used in the past in conjunction with the music he performed.

¶21    Golie argues that Brownlee's failure to object to this evidence was ineffective because evidence of gang affiliation was prejudicial to him and eroded the presumption of innocence, encouraging the jury to find him guilty upon a purported gang affiliation.  The State argues that the evidence was proper because Golie first invoked the term "brothers" when he spoke to Edmondson and his wife in their home, and was "highly relevant to proving that Golie was in fact attempting to influence" them.

¶22    Golie's reference to "brothers" during his confrontation with Edmondson made the term a permissible area of inquiry for the State.  However, no testimony or argument was offered to associate Golie with gang membership or activity, and both Golie and his wife testified that he was not part of a gang.  No rebuttal was offered to Golie's testimony that the term "Modern Outlaw" was related to his performance of music.  Golie has failed to carry his burden of demonstrating that Brownlee's decision to not object, and instead elicit explanatory testimony from Golie, fell outside the range of professional conduct.

¶23    *3.  Did counsel render ineffective assistance by revealing that Golie was on probation?*

¶24    During a discussion between Brownlee, prosecutor Ryan Weldon, Detective Brunner-Murphy, and the District Court, involving the chain of evidence for Golie's cell phone, Brunner-Murphy stated the phone was in police possession at the time he executed

10

a search warrant, but it may have been released thereafter. Brownlee replied, "Your Honor, that has—actually, Mr. Golie told me that was released to his probation officer and given back to him . . . ." Brownlee later acknowledged that she should not have mentioned Golie's status as a probationer, and elicited the following testimony from Golie:

Brownlee: One other real quick question: I mentioned, which I shouldn't have, but you were on probation in Missoula. That was a misdemeanor probation for DUI, correct?

Golie: Yes, ma'am.

Brownlee: Thank you. No further questions.

¶25 Golie argues that Brownlee's statement revealed he had been on probation and prejudiced him in the eyes of the jury because "it aroused the jury's sympathy and negative feelings toward convicted criminals and DUI without regarding to its utter lack of probative value." The State counters that reference to "a nonviolent traffic offense requiring no criminal intent" did not cause prejudice because the jury would have no difficulty distinguishing a DUI from the current charge, and was instructed generally about permissible uses of evidence of other crimes, wrongs, or acts.

¶26 In her postconviction testimony, Brownlee acknowledged she had sought and been granted a motion in limine regarding Golie's prior criminal history, and that it was error for her to reference Golie's status as a probationer. She explained her decision to recall Golie to the stand to address the issue, stating "[a]t the time it was a strategy in my head to maybe mitigate what they were thinking about Mr. Golie, because I thought if their mind

11

raised then about [sic] what he had done before, I thought it was better to maybe get it on the record that it was a misdemeanor and it was something—not a serious offense."

¶27 We agree with the District Court that Golie was not prejudiced by the brief reference to his probationer status. Unlike the crimes of witness tampering and intimidation, misdemeanor DUI is a nonviolent traffic offense that was clearly distinguishable from the allegations at issue. Any potential prejudice of the disclosure was mitigated by the instruction limiting the jury's consideration of other crimes, wrongs, or acts. We conclude that Golie has not demonstrated that the reference affected the outcome of the proceeding.

¶28 *4. Did counsel render ineffective assistance by not objecting to the admission of testimony that vouched for the testimony of others?*

¶29 When Brunner-Murphy was on the stand, the State elicited the following exchange:

Q. When you discussed or began to investigate the threats made toward Josh Edmondson from Mr. Golie, did you take those seriously?

A. Absolutely.

Q. Why?

A. For several reasons. The interviews that were conducted separately with [Edmondson], [Chaffin], and Logan [Brown] provided a lot of credibility because, you know, although their statements were given separately, there was a lot of consistency to what they had to say.

The other part of that is Mr. Edmondson was clearly extremely afraid. Mr. Edmondson—you know, I believe that during his interview with Officer Auch I think he had said that he was tearing up. And the fears—the statements that he provided that he was afraid of things weren't—they weren't what I would commonly expect somebody to say if they weren't telling the truth.

All someone has to do to accuse someone of intimidating them, for instance, is say he threatened to kill me. Okay, that would probably meet the element of that crime given the situation. Mr. Edmondson's

12

statements were very detailed down to I believe he had stated that Mr. Golie had even threatened his dogs. And his fears were very articulated as well.

Breanna talked about going out and taking her keys out of her vehicle and locking the doors. They talked about locking their doors for the first time in a long time. These are things that struck me as being truthful statements because it's not commonplace for somebody that's fabricating that kind of events to come up with all the details that you do when you are actually living a chain of events.

¶30 Brownlee had sought and obtained an order in limine prohibiting the State's witnesses from offering "testimony regarding the credibility of another witness," but offered no objection to Brunner-Murphy's testimony. In her postconviction testimony, she acknowledged that Brunner-Murphy was vouching for the witnesses, and explained she had a tactical reason for not objecting:

[Golie] and I were writing notes and looking at each other because, to be honest, at the time we felt like at the time Detective Murphy was looking less and less credible by saying this, because the testimony of those individuals was very poor and they didn't seem credible at all. And again, it seemed like the State kept saying we are not lying, we are not lying, really, really, we are not lying, and they didn't seem credible on the stand at all. And so when Detective Murphy was saying these guys are really, really credible, I was letting him go with it, because it seemed like he was making himself look less credible by saying that over and over again.

¶31 Golie argues that Brunner-Murphy's statements constituted vouching for the credibility of the State's witnesses and prejudiced him because credibility is a determination left solely to the jury, and Brownlee should have objected. The State responds that Brownlee had attacked the credibility of the witnesses in her opening statement, so the prosecution was justified in providing rebuttal credibility evidence.

13

Further, even if the testimony was improper, Brownlee had a "reasonable strategic explanation for her decision not to object."

¶32 We agree with the District Court that Brownlee's decision to not object was objectively reasonable. "The decisions on the timing and number of objections lie within counsel's tactical discretion." *State v. Matson*, 227 Mont. 36, 47, 736 P.2d 971, 978 (1987). It is not unreasonable for counsel to refrain from objecting if she reasonably believes that withholding an objection serves a defense purpose. Brownlee did not render ineffective assistance.

¶33 We conclude the District Court did not err in denying Golie's claims of ineffective assistance of counsel.

¶34 Affirmed.

/S/ JIM RICE

We concur:

/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

14