FILED

03/20/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0408

DA 16-0408

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 55

STATE OF MONTANA,

Plaintiff and Appellee,

v.

TIMOTHY ERIC RITESMAN,

Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 15-360
Honorable Leslie Halligan, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender, Koan Mercer, Assistant Appellate
Defender, Helena, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

Kirsten H. Pabst, Missoula County Attorney, Jennifer Clark, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  January 17, 2018

Decided:  March 20, 2018

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    The State charged Timothy Ritesman with aggravated assault after he allegedly strangled Amy Windmueller. The State also charged him with violating a no-contact order, based on his failure to comply with a condition of release in a two-week-old partner or family member assault (PFMA) case involving Windmueller. A Missoula County jury convicted Ritesman of both offenses. Ritesman appeals, arguing that the prosecutor deprived him of a fair trial when she told the jury in closing argument that its "job" was to ensure Windmueller's safety by returning a guilty verdict. He also contends that the conditions of his release in the PFMA case cannot support convicting him of violating a no-contact order. We affirm the aggravated assault conviction and reverse the conviction for violating a no-contact order.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2    On June 30, 2015, Windmueller reported to Officer Patrick Mulligan that Ritesman—a friend whom she had previously dated—had been harassing her and that she had a protection order against him. Mulligan searched for an order of protection but could not find any record of it. Windmueller left to find a copy of the order among Ritesman's belongings.

¶3    Windmueller asserted that she then encountered an angry Ritesman while searching for the protection order. As the two rode their bicycles along a sidewalk adjacent to a steep embankment leading to the Clark Fork River, Ritesman allegedly ran into her on purpose, knocking her and her moving bicycle down the embankment. Windmueller claimed that

2

Ritesman then assaulted her, strangled her, threw butane in her eyes, and made her believe he was going to "smash [her] head in" with a rock. She stated that she thought Ritesman was going to kill her.

¶4 Around the time that Ritesman allegedly assaulted Windmueller, Captain Chad Dever of the Montana Highway Patrol encountered Ritesman on the sidewalk above the embankment near where the alleged assault occurred. Dever had stopped to investigate a bicycle parked along the fence by the embankment that he recognized as stolen from his family. Dever spoke to Ritesman and determined that Ritesman had not stolen the bicycle. During their conversation, Dever heard a woman's voice from the river below, saying something to the effect, "Get away from me." Dever did not investigate, but returned to his vehicle to make arrangements to recover the stolen bicycle. Ritesman left the scene.

¶5 Shortly thereafter, Windmueller approached Dever's car and laid down beside it, crying. Dever observed that Windmueller was holding her shoulder and had a bruise on her forehead. Dever ascertained from Windmueller's statements that she had just been assaulted. Mulligan arrived at the scene shortly thereafter and transported Windmueller to the hospital. He noticed that Windmueller had a cut on her forehead, that her cheek bone was swollen, that she had scrapes underneath her torn shirt, and that she had red marks on her neck.

¶6 The State charged Ritesman with felony aggravated assault under § 45-5-202, MCA, for allegedly strangling Windmueller and causing her reasonable apprehension of serious bodily injury or death. It also charged Ritesman with misdemeanor violation of a no-

3

contact order under § 45-5-209, MCA. The State alleged that Ritesman contacted Windmueller in violation of an Order of Release and Order Setting Omnibus Hearing that the Missoula Municipal Court had issued two weeks earlier in a separate PFMA case against Ritesman. The order had conditioned Ritesman's release from custody in part on the mandate: "No contact Amy Windmueller."

¶7 At trial, the jury heard testimony from numerous witnesses, including Windmueller, Ritesman, Dever, and Mulligan, among others. Windmueller testified that Ritesman had strangled her and that she feared for her life. She struggled, however, to provide a coherent account of the order in which the events of the day of the alleged assault unfolded. Her testimony of when and how the alleged assault occurred also conflicted in part with Dever's and Mulligan's testimonies and with some of her own prior statements made to the police.

¶8 The State presented expert witness testimony that Windmueller's injuries were consistent with strangulation and that victims of violent trauma or strangulation often struggle to provide a coherent recollection of the assault. Ritesman testified that he did not strangle or assault Windmueller. He asserted that the extent of his interaction with her at the time of the alleged assault was that he encountered her from the sidewalk above the river, that he noticed she had his stolen backpack, that she threw his backpack in the river, and that he threw her bicycle down the embankment in retaliation.

¶9 In the State's rebuttal closing argument, the prosecutor closed with the following statement:

> This is the cycle of domestic violence. It's time, as a community, that we stand up for Amy, that we don't let this Defendant get away with his actions

4

because the traumatized victim is unable to give us a linear account of everything that happened. My job as the State, and your job as jurors, is to make sure that she is safe, to make sure that she is heard, and that we give the control back to her. You can do that with the verdict of guilty.

Ritesman's counsel made no objection to this statement.

¶10 The jury found Ritesman guilty of aggravated assault and of violating a no-contact order. The District Court sentenced Ritesman to fifteen years in the Montana State Prison with seven years suspended for the aggravated assault conviction. For the no-contact order violation, it sentenced him to six months in the Missoula County Detention Center, to run concurrent with his aggravated assault sentence. Ritesman appeals.

## STANDARDS OF REVIEW

¶11 We review de novo a claim of insufficiency of the evidence. *State v. Robertson*, 2014 MT 279, ¶ 16, 376 Mont. 471, 336 P.3d 367. We review evidence in a criminal case in the light most favorable to the prosecution; we will uphold a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Sheehan*, 2017 MT 185, ¶ 17, 388 Mont. 220, 399 P.3d 314.

¶12 In general, this Court does not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. *State v. Lawrence*, 2016 MT 346, ¶ 6, 386 Mont. 86, 385 P.3d 968. We may exercise our discretion, however, and review such issues under the plain error doctrine. *Lawrence*, ¶ 6. We use our inherent power of common law plain error review sparingly, on a case-by-case basis, and only in a narrow class of cases. *State v. Lackman*, 2017 MT 127, ¶ 9, 387 Mont. 459, 395 P.3d 477. We will not undertake full analysis of the alleged error each time a party requests plain error

5

review.  *State v. Griffin*, 2016 MT 231, ¶ 7, 385 Mont. 1, 386 P.3d 559.  Conducting a full analysis in order to determine whether to find plain error would defeat the underlying rule that a party must object to error at trial, because errors should be brought to the attention of the trial court where they can be initially addressed.  *Griffin*, ¶ 7.

**DISCUSSION**

¶13    *1.  Whether the State presented sufficient evidence for the jury to find Ritesman guilty of violating a no-contact order*.

¶14    Ritesman argues that the State failed to present sufficient evidence that he violated a no-contact order under § 45-5-209(8)(a), MCA.  He contends that the State failed to prove the existence of a no-contact order "issued under" § 45-5-209, MCA, a necessary element of the charged offense.  In Ritesman's view, the release order that the State admitted into evidence did not constitute a no-contact order under the statute.

¶15    The State, by contrast, argues that Ritesman's violation of the condition of release that he have no contact with Windmueller satisfied the requirements of § 45-5-209(8)(a), MCA.  Citing § 45-5-209(9)(a), MCA, the State notes that a no-contact order is "a court order that prohibits a defendant charged with or convicted of an assault on a partner or family member from contacting a protected person."  In the State's view, the Order of Release and Order Setting Omnibus Hearing meets this definition, because it prohibited Ritesman from contacting Windmueller.

¶16    Section 45-5-209(8)(a), MCA, provides: "A person commits the offense of violation of a no contact order if the person, with knowledge of the order, purposely or knowingly violates any provision of any order *issued under this section*."  (Emphasis added.)  Section

6

45-5-209(1), MCA, permits a court to issue a no-contact order against a defendant charged with or arrested for PFMA. The statute provides that the no-contact order "must state" the following:

> You have been charged with or arrested for an assault on a partner or family member. You are not allowed to have contact with _____ (list names) . . . *Violation of this no contact order is a criminal offense under 45-5-209, MCA, and may result in your arrest*. You may be arrested even if the person protected by the no contact order invites or allows you to violate the prohibitions. This order lasts 72 hours or until the court continues or changes the order.

Section 45-5-209(5), MCA (emphasis added).

¶17 The Municipal Court's Order of Release and Order Setting Omnibus Hearing set Ritesman's bail and included conditions for his release from custody. One of the conditions stated, "No contact Amy Windmueller." The order stated: "Failure to comply with the above conditions could be cause for the Defendant's bond or release on own recognizance being revoked and an arrest warrant being issued for the arrest of the Defendant." Ritesman acknowledged at trial that the Municipal Court prohibited him from contacting Windmueller, and there is no dispute that Ritesman violated this condition.

¶18 The Municipal Court's order did not, however, constitute a no-contact order "issued under" § 45-5-209, MCA. The order did not include the mandatory language of § 45-5-209(5), MCA, or make any reference to that statute. Importantly, the order stated only that violation of its conditions "could be cause for" revocation of Ritesman's bond or release. It did not inform Ritesman that contacting Windmueller would constitute "a criminal offense under 45-5-209, MCA." *See* § 45-5-209(5), MCA. By the plain language

7

of the statute, its notice requirement must be met before a person may be charged with a separate criminal offense for violating a no-contact order issued under § 45-5-209, MCA. The State's remedy for Ritesman's violation of the Municipal Court's release order was to petition for revocation of Ritesman's release, not to pursue a criminal charge under § 45-5-209(8)(a), MCA. *See* § 46-9-503(1), MCA ("If a defendant violates a condition of release . . . the prosecutor may make a written motion to the court for revocation of the order of release."). The State failed to prove that the release order was "issued under" § 45-5-209, MCA, or that it contained the statutorily required notice. The State did not prove the elements of the offense, and Ritesman's misdemeanor conviction may not stand.

¶19    *2. Whether the prosecutor committed misconduct prejudicing Ritesman's right to a fair trial and warranting plain error review.*

¶20    Ritesman urges this Court to reverse his aggravated assault conviction and order a new trial due to the prosecutor's alleged misconduct. He argues that the prosecutor's statement during rebuttal closing argument that the jury's "job" was to ensure Windmueller's safety improperly inverted the State's burden of proof by encouraging the jurors to resolve any doubts in favor of the State. Ritesman contends that the prejudicial effect of this statement was exacerbated by the prosecutor's additional statement that defense counsel had engaged in "victim-blaming" during his closing argument, and by the State's introduction of Mulligan's testimony that he had conducted a "lethality assessment" of Windmueller, determined that she was at a "high risk" of death, and believed she was "scared that afternoon of imminent death." Because his counsel did not object to these

8

instances of alleged misconduct at trial, Ritesman urges this Court to apply plain error review.

¶21 Under the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution, criminal defendants are guaranteed a fair trial. *State v. Stutzman*, 2017 MT 169, ¶ 16, 388 Mont. 133, 398 P.3d 265. In reviewing a preserved claim of prosecutorial misconduct, "we consider whether the prosecutor's comments were improper and whether they prejudiced the defendant's right to a fair trial." *Stutzman*, ¶ 16 (citation and internal quotations omitted). "[W]e consider alleged improper statements during closing argument in the context of the entire argument." *Lawrence*, ¶ 13 (citation and internal quotations omitted). We do not presume prejudice from alleged prosecutorial misconduct; rather, the defendant bears the burden of showing "that the argument violated his substantial rights." *Lawrence*, ¶ 13 (citation and internal quotations omitted). When the argument is made for the first time on appeal, "we first determine whether the defendant's fundamental constitutional rights have been implicated." *Lawrence*, ¶ 9. Even then, we will not invoke the plain error doctrine to reverse a conviction when "the alleged error did not result in a miscarriage of justice, raise a question as to the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Lawrence*, ¶ 11.

¶22 The District Court instructed the jury on the elements of aggravated assault and informed it—orally and in writing—that the State had the burden of proving each element of the offense "beyond a reasonable doubt." The court informed the jury that its function was to "decide the issues of fact resulting from the charges filed." The court admonished

9

the jury that the law forbids it "to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The jury instructions stated, "The Defendant is presumed to be innocent of the charge against him. This presumption . . . is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the Defendant is guilty."

¶23 In closing argument, the prosecutor summarized the evidence that she maintained proved that Ritesman physically attacked Windmueller and caused her reasonable apprehension of death or serious bodily injury. The prosecutor argued that Windmueller's injuries and the testimony from Dever and Mulligan corroborated Windmueller's claim that Ritesman assaulted her. She highlighted Windmueller's demeanor after the assault—as recorded by Dever's microphone—and during trial as corroborating Windmueller's assertion that she feared for her life during the alleged assault. The prosecutor acknowledged "inconsistencies" in Windmueller's testimony, but emphasized that Windmueller had been consistent in her assertions that Ritesman strangled her and that she thought she was going to die. The prosecutor emphasized the expert witness testimony that trauma victims often have difficulty providing a consistent, coherent narrative of an assault.

¶24 Ritesman's counsel argued in response that the State bore the burden of proving each element of aggravated assault beyond a reasonable doubt. He highlighted the inconsistencies in Windmueller's testimony and argued that those inconsistencies created doubt as to her claim of assault.

¶25 In rebuttal, the prosecutor argued that "there's lots of evidence in this case, lots of physical evidence that corroborates that what [Windmueller] told you was true." Acknowledging Windmueller's imperfect recollection of events, the prosecutor explained, "Those are things that she's trying to put together after she suffered a traumatic event. She's doing the best that she can." The prosecutor told the jury that, despite Windmueller's confusion, "everything she told you happened at some point." The prosecutor also referred to the defense's emphasis on Windmueller's inconsistent narrative as "victim-blaming."

¶26 The prosecutor acknowledged the State's burden of proving each element of the charged offense beyond a reasonable doubt, and she argued that the State had done that. The prosecutor defined "reasonable doubt" as "a doubt that you can articulate." She told the jury to "listen to the facts," and she stated, "[W]hat you're here to decide today is— was Amy in fear of death? Was Amy in fear of serious bodily injury?"

¶27 The State acknowledges on appeal that the prosecutor's final comment regarding the jury's "job" was "not proper." Indeed, the jury's "purpose and duty" is to "decide if the State has proved" the defendant's guilt beyond a reasonable doubt, based on the facts presented, *State v. Hart*, 191 Mont. 375, 385, 625 P.2d 21, 27 (1981), not to decide the case on the basis of sympathy or advocacy for the victim. *See also State v. Bekemans*, 2013 MT 11, ¶ 20, 368 Mont. 235, 293 P.3d 843 ("It is the jury's role as factfinder to evaluate the credibility of witnesses, weigh the evidence, and ultimately determine which version of events should prevail."). The prosecutor's comment was improper, and the nature of the remark implicates Ritesman's right to a fair trial.

11

¶28 The record does not convince us, however, that this isolated incident of alleged misconduct resulted in a miscarriage of justice or compromised the integrity of his trial. The District Court clearly instructed the jury that its role was to determine the facts of the case and to decide from the evidence whether the State had met its burden of proving each element of the charged offense beyond a reasonable doubt. The State focused its closing argument on the evidence that tended to prove beyond a reasonable doubt Ritesman's commission of each of the elements of aggravated assault. "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *State v. Aker*, 2013 MT 253, ¶ 27, 371 Mont. 491, 310 P.3d 506. Ritesman has not persuaded us that the prosecutor's isolated comment in rebuttal closing argument— taken "in the context of the entire argument," *Lawrence*, ¶ 13—prejudiced his right to a fair trial. Nor has Ritesman demonstrated that the prosecutor's "victim-blaming" statement was improper or that her questions to Mulligan demonstrated plain evidentiary error. Ritesman's claims do not warrant a new trial.

## CONCLUSION

¶29 We reverse and vacate Ritesman's misdemeanor conviction for violating a no-contact order. We affirm his felony aggravated assault conviction.

/S/ BETH BAKER

12

We Concur:


/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ JIM RICE